Little v. Shell, Exploration, et al. All right, Mr. Connolly, when you're ready. Good morning, and may it please the Court. I'm Sean Connolly, together with co-counsel Michael Porter and Dick LaFond, representing the plaintiffs' relators in this False Claims Act case. The issue before the Court is whether the District Court improperly dismissed the complaint as one based on public disclosures. This case and this same issue have been before this Court previously. In 2012, Judge Southwick's unanimous opinion for the Court held that the District Court had erred in dismissing the case and remanded for further consideration. Tellingly— Okay, and what is it that you would expect—I mean, I understand you wanted to win, but if you were going to lose, what is it that you would expect the District Court to do that the District Court didn't do? I mean, what is the lack that you're pointing to? The District Court did go back, issue a new opinion. I know you felt it wasn't timely and all that, but what is it specifically that the District Court did not do that you feel should have been done to support the dismissal? Well, one thing it did not do and many things it did do. What it did not do is not once mention the public disclosure analysis set out by Judge Southwick for the Court in three pages at 690 F. 3rd at 1292 to 1294. The District Court never once mentioned that analysis, and nor did it apply it. Instead, it contravened it in at least three respects. First, this Court's opinion in 2012 said that the complaints here by these relators were specific, specific and detailed. What did the District Court do? Ignoring that opinion, the District Court called these complaints speculative. Now, the first four letters are the same, but I think the words are different. Specific is not speculative, and so if you're going to ignore the opinion, at least don't contravene it. And that's a key, that first contravention is key, because Judge Southwick's opinion said you have to compare the specificity of the complaint here with the specificity or breadth of the alleged prior disclosures. This Court, in holding that they're specific detailed, said it's not apparent to us that you could have relied on the broad public disclosures to produce this specific complaint. Is there any magic to the District Court making this analysis? I mean, are you asking us to make this analysis, or are you asking us to send it back for a different judge to make this analysis? We're asking two things. I think you can make it de novo in the first place and say, because I don't think it's a hard question. I think you can say as a matter of law, a mixed question of law, in fact, an overview, that this specific complaint was not based on public disclosures. I mean, what I'm trying to understand is why send it back. If there's not any discretionary element, no factual sort of element to it, and I don't know of one, but if there's not, then why would we have we, the Fifth Circuit, sent it back in the first place instead of just saying, look, we've made the comparison, and it is or isn't a public disclosure? Because if it was a public disclosure, why are we messing around with going back to the District Court? And if it isn't, why are we messing around with making the District Court look at it? Let's just get on with it. Fair question. And I can't read this Court's mind in 2012, but I think I could suggest this hypothesis. In 2012, there was another issue before the Court, is can government relators have standing to bring these actions? This Court held they could as a matter of de novo. Second, it had then reached the public disclosure issue. Shell had put in at that time, and still in the record, over 2,000 pages of items that were alleged public disclosures. And the District Court did a scatter shot and just kind of picked a bunch of them and said, oh, yes, disclosure, disclosure, disclosure, disclosure. And I think after this Court did the heavy lifting in terms of the legal issue of do relators have standing, and then said. . . Tired and didn't want to go through the two. . . Well, I don't know if it was tired. I think it said, the District Court, you know, you've, there's a lot out here. You applied an overly broad standard. You didn't get it right. Go apply the correct standard, and we'll trust you to get it right. Sort through all this voluminous materials, which now Shell doesn't really rely on 2,000 pages. They rely on, you know, on a few disclosures. And I think we'll, we can knock them out. This Court can easily knock them out and say that none of those disclosures reveal the specific fraud. So I think what the District Court did wrong, not only ignoring the opinion, contravening it in terms of specific versus speculative, which I think is a pretty direct contravention of it. Second, the District Court, or this Court, Judge Southwick said, one of the categories you relied on are audits, private audits. And if they were not public, that they are not a proper subject for analysis. What did the District Court do on page two of its opinion? It said there are three public disclosures. The third one is audits. Audits that this Court specifically said are not a proper subject of analysis. That's a second direct contravention. The third is that this Court twice said in the opening paragraph of the opinion, saying we're going to reverse the District Court on page 1284, and then on page 1293 of the opinion, criticized the District Court for applying an overly broad conception of the public disclosure bar. What did the District Court do on remand? Page two again said this is a broad bar, never once recognizing that, wait, you've been told by the circuit that you've taken an overly broad conception of it. So three distinct ways it contravened this Court's mandate and analysis. I mean, the case has to go back, doesn't it? This is a preliminary defense. This is a preliminary motion. Oh, it absolutely has to go back. It should go back. It's eight years old, but we're still stalled in this case. I mean, the case is just beginning, really, as far as. . . Absolutely. We're eight years into this case. We made the analysis and found there was a public disclosure we could affirm, right? Even if we found the District Court didn't do a very good job in the. . . This isn't new court where we're, like, rating his work. We're getting to a bottom line. So if we made the analysis ourselves and said, yes, it was publicly disclosed, it would be done. We would affirm. You would affirm. Walk us through why it's not publicly disclosed. To me, it sounds like we're going to have to do that analysis either way. Yep, I think you do, and it's de novo. I think you start, as Judge Southwick said, the starting point is look at the specifics of the complaint. The complaint identifies 12 specific leases by number. Leases are not public. Judge McConnell in the Maxwell case, which we argued in the Tenth Circuit case, and this court cited it there, said a similar issue in terms of public disclosure, said these are not public leases. No indication of the record that these leases are public. So there are 12 leases that were detailed in the complaint and said these leases prohibit deduction for transportation because this is oil, royalty, and kind. This is different from every other prior case. This is not oil where you pay royalties as a percentage of the sales price or the value. This is not value. This is oil, royalty, and kind. So when they bring this oil to the measuring point in the first place where it surfaces on each of the 12 leases. We actually give you the oil. We give you the oil. And then at that point, it's actually the government's responsibility to transport it downstream. So the government has to pay then to transport it. So there's no possibility on these leases, and this is the complaint allegations which have to be taken as true. We're eight years down the line, but there's, you know, the complaint still has to be taken as true at this point. There is no possibility for transportation on any of these 12 royalty and kind leases. That's the allegation that has to be taken as true. And then the complaint details contrary to the leases, contrary to the law, the Shell, in fact, took deductions. And it details month by month based on MMS 2014s, which are not public. It details exactly how much they took. And that's laid out in the complaints. Now, the one thing that I wonder about, and I realize this isn't the question on public disclosure, but Judge Hughes said basically that the government has looked at this and said not just that they don't want to intervene, but that what Shell did was lawful. And if that's so, aren't we just churning our wills, you know, for nothing? I'm glad you asked. And he cited things that are not in the record. He cited inspector general reports that he went out of the record to find and ignored competing inspector general reports that we cited that said there are improprieties between the Shell-MMS relationship, and those are also subject to vice. Are you saying this was a hokeyed-up deal because the inspector general people involved were involved? I'm not accusing the inspector general of anything. I'm just saying that that's the conclusion they made. They made that same conclusion, Your Honor. We argued the case and won the case in Maxwell in the Tenth Circuit. So you're saying that's still a disputed issue? That's absolutely disputed. And that's not something you can find at this threshold stage where the complaint alleges to be contrary. I know, but I just really hate to waste eight years and two Fifth Circuit appeals and all this for something that the government already thinks is just fine. Oh, well, I don't know the government thinks. And in any event, that same thing was said in Maxwell. Maxwell resulted in a $23 million verdict that the government happily accepted, and a jury found that there was wrongdoing and false statements. Same thing was said. I'm confident in this case. We've taken this through eight years, not being paid for it, and hopefully getting hourly rates and contingency rates down the road. But we are all very confident in this case. That doesn't prove anything at all. But it's just saying the complaint's taken as true. The complaint lays out a very discreet, detailed scheme. And at this point, nothing, and you could not possibly have conjured up and written this detailed complaint based on public disclosure. Let me talk about the disclosures now. After I've talked about the specific complaint based on – actually, one other point on that. Page 2 of the government's brief, they accuse – they say that these are government auditors relying on government information. Well, precisely. It's not relying on public information. It's relying on information that was non-public and known to the government. But in any event, so based on the public disclosures, the first – Has there been any action taken against your clients pursuant to the suggestion by Judge Garza in the original opinion? No. No, I mean, the Inspector General report said no action would be taken. Go ahead. And so this is something that – and it was the same thing happened to an auditor, Maxwell, who successfully prosecuted the case in the Tenth Circuit. But anyway, the first alleged public disclosure is rulemaking in 98 and 2000, where Shell said it's not fair. We should be able to take deductions for subsea movement on these offshore leases. They had their First Amendment right to lobby and to tell their government and tell the executive branch and the legislative branch to change the rules. The rules were not changed. But that does not – and so it's clear Judge Hughes said, well, that shows they would have liked to take the deductions. Well, sure it does, but it doesn't show that they – after being told you can't take these deductions, that you're going to take them anyway a year later. So the rulemaking, I think, actually cuts against any argument that there's a disclosure of any wrongdoing. The second kind of batch of alleged prior disclosures are administrative and litigation. And let me talk about the litigation first. The first litigation allegedly disclosed this fact or this scheme is a case called Davis. Davis was filed by or later against every oil company, 45 defendants. So it's just a broad-bust scattershot saying all of you are taking improper deduction, mainly on leases prior to 1988 that allegedly, in the relator's view, did not allow any deductions at all for transportation. That just as a matter of law, under the lease language and under the regulations, the argument was that you can never take an improper – never take a proper transportation deduction. That's not the allegation here. And so I think that's just a broad complaint that reveals nothing about these 12 leases and about royalty and kind oil on which no transportation would ever be possible because you're not doing any transporting. That case didn't involve a distinction between gathering and transportation at all, huh? Well, it did. I mean, the argument was that everything is, quote, gathering. And it happened to be natural gas also, but that just said that under the lease language there's no such thing as valid transportation, there can never be transportation, even from platform to shore. That was – you know, the argument was that this is upstream. This is upstream movement of royalty and kind oil. That was basically saying even if you're moving oil from platform to shore, you cannot take valid transportation because that's all part of your obligation to bring it to shore. But it didn't involve what you have here, the distinction between gathering and transportation, where they allowed deduction on transportation and not on gathering. No, correct. It did not involve upstream movement, which is always gathering. And so, no, it involved pure what we would admit was transportation. This is a case where I'm picking up the merchandise at the store, and the government, I being the government, the government is picking up the merchandise at the store as opposed to having the merchandise delivered to their front door. Good analogy. And so there isn't any, you know, there isn't any FedEx or UPS charge because I'm going to the store to get it. Much better way to put it. I wish I had thought of that. That's a clean analogy. So I think in the Wright case, the argument was even bringing it to the person's home cannot be transportation because that's not allowed. That's all part of your obligation. It's kind of like your Amazon, you get free shipping maybe. That was a theory, basically, if you're using your court's analogy. But that doesn't disclose this. I mean, that was years ago, and this is one company doing something on royalty and kind. Because, I mean, because taking kind, I'm actually picking up the package. I'm not just making money off the merchandise as you do in a general royalty where I just sit there as a royalty owner and collect. I'm getting the package in my hand, but I've got to go to get it. You've got to bring it home. I've got to go to the store and get it. You've got to go to the store and get it. Or I've got to hire somebody to go pick it up. And, in fact, the government does hire people to bring it in, so they actually pay for transportation. What Shell can't do is that. So that's that case. The Johnson case is a case that involved pricing, valuation, not royalty and kind. And the question was, you're charging, you know, you're pricing for transportation. Onshore prices are too high. The government even concedes that the case is different. They say, well, the settlement agreement in 2001, before our scheme started, reserved the right to challenge transportation deduction on various leases, one of which happened to be ours. It doesn't tell anything about that. That's not a disclosure of the question this court said. You have 45 seconds to tell us what is new between the last appeal and this one that would change the outcome about sending it back to Judge Hughes if we sent it back. Exactly what he did and did not do. I mean, it's stunning to me that a district judge would say, I'm going to ignore an opinion. You know, I think normally you would kind of say, I was remanded, told to do it this way, I'm going to follow the directions. But then not only ignore it, but contravene it. And I think that, and that Daimler-Chrysler, the 2002 case of this court, one of the factors cited was that the court did not follow the mandate. Plainly that's the case here. We're now eight years into the case. We were only six years then. The case is still stalled. We just want to get it moving before a judge that moves it forward with the appearance of fairness. What happened in the case in the district court? I mean, how long was the case there after the remand? Two years. Two years. The district court, to be fair, was fully briefed for nine months. And the district court sat on it for nine months. The biggest delay was the first time. Four years of delay squarely in the hands of Judge Hughes. So it's eight years, five of which are squarely at the hands of the district court. Okay. Thank you very much. Thank you. Okay. Mr. Dakovich. May it please the court. My name is Matt Dakovich. I represent the Appleteys shell. In its prior opinion in this case, this court expressly foresaw the result relators are appealing. When it remanded the public disclosure issue, it said that the district court's initial conclusion that the public disclosure bar applied could be correct and that the case may well need to be dismissed on remand. Well, after reexamining the summary judgment evidence, that's what the district court concluded. Do you agree there's no magic to that in the district court? In other words, we can make this analysis and we can say whether or not Judge Hughes did what he was supposed to do on remand, there has been a public disclosure or there hasn't been. We are capable to do that. There's no need of a district court fact-finding or anything like that. Yes, Your Honor. It is a de novo review. There's no real factual dispute here. And you have the disclosures in the record. And I think the court can make the analysis and decide whether the public disclosure bar is triggered. And that's really the point. They want to say that Judge Hughes ignored and contravened this opinion. That's not true at all. He followed this court's mandate and its opinion. But to me, that doesn't matter except for the issue of whether we would transfer it to another judge if we sent it back. To me, the question is, was it publicly disclosed or not? If he didn't do a very good job of writing it up but it was publicly disclosed, then so be it. If he did a great job writing it up but it wasn't publicly disclosed, so be it. And that's exactly right, Your Honor. I agree with that completely. The issue is whether the district court reached the right result, and he clearly did here. If it did not, it still requires a remand. If he did not reach the right result, then that would require a remand. But this court can and should affirm because he did reach the right result. If there was a public disclosure, we would affirm whether Judge Hughes wrote it correctly or not. Correct. Right. If there's not a public disclosure, we would need to remand, and the question would be to which judge. Correct. Okay. That's right. All right, let me go. You know, the very last sentence of the last opinion says, We therefore remand for that court to reexamine the summary judgment evidence. The district court should determine whether the public disclosures identified in the motion reveal either that Shell was deducting gathering expenses prohibited by program regulation or that this type of fraud was so pervasive in the industry that the company's scheme would have been easily identified. Now, which one of those prongs did the district court rely on? Well, I think the district court relied on the first one. The district court looked at the public disclosure to see if they revealed that Shell was deducting gathering expenses. Now, tell me what disclosures reveal that. Sure. And the first disclosure is this right complaint. So we've cited most of the most important disclosures in the supplemental record excerpts. Tell me now. You can go through. Just tell me your best disclosures. Okay. Give me however many you want to give me, two or three of your best disclosures. Thank you, Your Honor. There's about four of them. There's four or five, and the most important one is right on point. Start with the right QTAM complaint. That was a complaint that was last amended in 2004. It was a very lengthy complaint. It contained broad allegations against Shell and other defendants, but it specifically named Shell, so it's Shell-specific. So it's not kind of an industry-wide thing here. There were several Shell entities named in it. It's right in the middle or towards the end, actually, of the period covered by relator's claims, because they're claims they alleged that Shell was taking these deductions improperly from 2001 to 2005. This was amended in 2004 and was current through then. It alleged that Shell was taking deductions for transportation, transportation deductions on MMS 2014 forms that Shell was not allowed to take in the offshore oil and gas context. Didn't they say that they weren't entitled to take any transportation costs? It did. Actually, the relators, he had several theories there. The first one was that he claimed that the leases, the statutes, and the regulations didn't allow any transportation deductions at all, and so it was improper for Shell to take them. But also, if you look at, I want to draw the court's attention very specifically to paragraph 372, subparagraph 6 of the Wright complaint. He had sort of a catch-all allegation as one way of looking at it, where he said, if these leases do allow or if the regulations and the lease claims, if transportation deductions are allowed, then Shell has still engaged in an illegal practice of taking transportation deductions for what is really gathering. And it even said that the exact words were- Were those in-kind leases? Well, actually, there was no distinction in this case, in the Wright case, about whether they were in- these allegations about whether- So we don't know. We don't know. They would have encompassed in-kind deductions. So does Shell now have, because Wright files this hugely broad thing against 45 companies, whatever, does Shell now have a free ride to just lie, cheat, and steal on transportation expenses, and nobody's going to be able to call them out on it? Well, first of all, it's a broad complaint. It covers all these leases, but there are some specifics to it. It's Shell-specific. The time period is the same as Relator's allegations. When you look at what they're alleging, they're zeroing in on transportation deductions that are taken on MMS 2014 forms. Those deductions show up on MMS 2014- But aren't they always taken on those kinds of forms? Always, whether the deduction relates to- The form number isn't magical. Right. All right, so what is magical about Wright, that they named Shell and that they talked about transportation? Right, and that- Wouldn't that seem to give you guys cover for whatever you now feel like doing, if that's good enough? No, it would not. On transportation? I mean, you can now just deduct what you want and hope nobody catches you? No, because these are specific allegations. Tell me what's specific, because I've got your record excerpts here. Point me to it. Okay. Paragraph 376. Let me just ask you one thing. You didn't talk about the specific wells and fields where that was going on, that it's consistent with what they allege here, are you? No, there's not. In Wright itself, it covered all offshore leases, all offshore leases dealing with Shell, and said it had engaged in this practice. Well, all offshore leases dealing with Shell and 44 other companies, right? Right. This is pretty much the whole universe of offshore drilling. That's a little hard to call that specific. Well, it's specific in the sense that it is identifying the scheme, and of course, if you go look at the precedents- Tell me the paragraph you were about to tell me the paragraph. Paragraph 372, subparagraph 6, and that would be record page 1826. Shell and others are taking transportation deductions with respective pipelines determined to be production or gathering facilities. That's the sub-C component. This is regulation by FERC, but I thought that their argument is it's the lease that doesn't allow the transportation expense, not FERC. Well, their argument is that they're zeroing in on these deductions that are being taken for transporting the oil from the sub-C manifold- And they're saying that's because the lease doesn't allow it, not because there's some regulation, some CFR out there that doesn't allow it, which is what 6 seems to be dealing with. Oh, right. Well, it mentions the facilities are exempt from regulation under FERC, but I think the thrust of that paragraph is saying that Shell is taking deductions for movement that is not true transportation but is gathering. And that's exactly what Relator's complaint is here. That's exactly what it is here. Was the regulatory scheme the same then as now? See, it's – yes, the gas – they mentioned that this was a gas case. It was a gas case, but, you know, the courts have looked at – we have cited a case where the court says there's no real distinction between gas and oil in this context. The regulations are largely the same in terms of how to calculate deductions and royalties and all of that that's administered by the MMS, and it's largely the same today as it was when they filed their complaints. Okay. Give me your next disclosure. Okay. The Johnson Settlement Agreement. The Johnson Settlement Agreement. This was a settlement agreement between Shell and the United States in a 2001 case. Actually, the settlement agreement was entered and made part of the record in 2001. It was the Johnson-Ketam case. In that settlement agreement, paragraph 17M, the government identified certain oil and gas leases. And, by the way, Johnson dealt with offshore oil leases generally. But it identified – This is a public document. It's a public document filed as part of the court record, and it identified the – certain oil and gas leases held by Shell. And not only that, it referenced the transportation deductions practices by Shell with respect to those leases. Tell me the paragraph. 17M, paragraph 17M, which is record page, I believe, 2061. And it said with regard to those transportation deductions on those leases – which those leases, by the way, included one of the 12 that were laters have zeroed in on here, one of the 12. And it said it was preserving its right to audit those deduction practices, and it was preserving its right to assert any claims or liabilities in connection with those. And then you turned – it had an attached spreadsheet, actually, further listing out the leases, and it identified the deductions, the deductions by name, sub C and TLP, the Tension Lake Platform deduction. Those are the exact two deductions, practices that were laters are challenging. And so the government here was announcing to the world on this public record that it was going to be taking a look at this very, very issue. And so when you get back to the standard for triggering the public disclosure bar, this based upon standard, which is one of the fairly low legal threshold as the courts have looked at it, and this court says case only needs to be partly based on public disclosures and so forth. This was far more than the kind of disclosure that would have put the government on the trail of any fraud, which is another one of the ways this court has described the standard for triggering the bar. Was the disclosure detailed enough? Not that it matched the relators' allegations detail for detail, but was it detailed enough? Did it give enough of the essentials? Well, it certainly was not the same time period. This was 2001, Your Honor. The settlement agreement was entered in January of 2001. They claim that Shell began taking the deduction practices, or at least the deductions that they are challenging, go back to 2001. So they say March of 2001. So they sign this agreement and they run out and start violating the law? Well, no. What this agreement is is the government saying to Shell, to the world, that we are on the trail of any fraud. This is a statement by the government. I don't see a reservation in a settlement agreement as saying we are on the trail. Settlement agreements tend to be broad. You have every word under the world that means release that goes on for three pages of synonyms to release. And then you go, but wait a minute, we don't know about this one thing. I don't know if I might have a claim for this, so I'm just going to accept that because you've got this three-page long synonyms for release. And, I mean, I've been involved in those settlement agreements for years as a lawyer, and I don't know that it ever came back up again. I mean, that just went into a dusty file and that was the end of it. So I don't know that that means, oh, we are going to pursue that. Sometimes you bracket a claim, the claim pending and such and such. But just this except for any claims that have, you know, that involve X, it's just because we're a big company, we don't know what else is going on, we don't know what the left hand is doing with the right and all that. So I don't see this as putting them on notice that, hey, we're coming after you. It's just accepting stuff they might not know about. Well, you know, I think if you look at the facts of what actually happened, a year later, as this Court pointed out, as Your Honor pointed out in the last argument, the government did issue a report, this OIG report, saying that it didn't find any wrongdoing here. They've cited some. They were doing it is what you're saying. Yeah, and they've cited some OIG report that is not, that is truly not on point. It deals with the royalty in kind program, not the same folks the auditors would be looking at the deductions, transportation deductions. That was done by a different office. But the audits that they point out that the district court took notice of, in 2002, the MMS began auditing the shell, actually on five of the same 12 leases. So that's some indication of what that settlement agreement wasn't just, as you say, like kind of a broad reservation of claims. And it's very specific, actually, if you turn to look at the spreadsheet and how it calls out transportation deduction practices, sub C, TLP, the exact two by name that they challenge. Okay, what's your next disclosure? And, okay, the next disclosure would be the Auger decision. That was a IBLA decision, Interior Board of Land Appeals from 1997. That allowed shell to take as a transportation deduction a portion of the capital cost for locating transportation equipment on its deepwater TLP platforms, which is the exact one of two deductions that they're challenging here. Now, they say this was royalty in kind. The government was transporting to shore. Therefore, under Auger, it was just not possible. The law wouldn't have allowed us to take this deduction. But if you read the Auger decision, which we've excerpted and put in, I think actually the Auger decision is in the record excerpts in its entirety, there's no limitation in the Auger decision that they want to read into it. That somehow conditions the ability to take this TLP deduction on shell being or shell's affiliate being the one to actually transport the product from the platform to the shore. It's a platform cost that shell is deducting. It's a platform cost that shell, as platform owner, incurs, whether or not it is also the one that is transporting the product to shore. It's a capital expenditure that was integrally related to the transportation function. So I don't understand how this would alert you to anything. Well, you combine this with the other disclosures. We've excerpted a letter. So this wasn't just looking at the Auger platform. You go and look at in October of 1999, shell in connection with another platform says we're going to take these deductions with regard to the Mars platform in that instance. Shell was taking these deductions generally. The Johnson settlement points out the government well knew that shell was taking these deductions. And these were in kind, again, the taking kind leases? Well, these were taking kind leases. Relators are alleging they were taking kind leases. So this is a cost that is being incurred by shell, and it's recovering that cost because it doesn't matter. Out of the oil? Well, see, that's the thing. They're taking a deduction on the MMS 2014 form when they're reporting and paying on other royalties in value. I'm just trying to understand this in the in kind world, how you take the deduction. Right. So the statute, and when you're delivering oil in kind, if the statute expressly recognized that there would be circumstances in which you would be entitled to be reimbursed for taking the transportation deduction. Requesting a reimbursement. Yeah. It's not really a deduction unless you're deducting it out of the oil. Right. It's actually a deduction out of the in value payments because that's what the law said. It says when you transport royalty oil or when you're entitled to a transportation reimbursement in the royalty in kind context, the way you can achieve that is you go to those MMS 2014 forms where you're reporting and paying in value for your other leases and you take the deduction there. That's what Wright zeroed in on. All of those deductions, whether they related to in kind or in value, and that's what these relators do. They're all looking at the same exact place, these deductions on 2014 forms. But I'll share one lawsuit in Augur arguing that they wanted to deduct part of a capital cost that were closely related to transportation costs. There wasn't a dispute about whether they were going to deduct gathering costs. I don't understand your argument on how that would alert anybody to anything about this alleged scheme. Well, because these are the exact deductions that they're challenging are what was allowed in Augur. So it was a transportation deduction that was allowed in Augur. First, Shell asked MMS can we take this deduction. MMS initially said no.  That's a cost of marketing. It's not fairly deductible. IBLA then on appeal said yes it is. That's a transportation cost. And in that instance, so Shell, it's related to transporting the product ashore. Peripherally related but certainly not explicitly related to this scheme. Well, they, the relators disagree with Augur. They think it's very limited. But Augur decision authorized these TLP deductions as a transportation deduction. And, of course, Shell after litigating that was going to take those deductions. It was going to do it. Johnson's case shows the government knew that it was taking it. They're on the face of these MMS 2014 forms, very obvious. Do you have another disclosure? We have the Mars. List them and then I want you to address the issue of whether it should go back to Judge Hughes if it goes back. Yes. List the other disclosures you want to tell us and then just. The other disclosures very quickly is the Mars disclosure and the Dennett memorandum. That's also in the record excerpts. That involved the subsea gathering and whether it's gathering versus transportation. And that would. You've attached your best disclosures as your record excerpts. Correct. That would be the place to look. Okay. Correct. Why should it go back to Judge Hughes if it goes back? Well, this court has already ruled there is no basis for changing, reassigning to the courts a rarely invoked power. Largely what they're complaining about is stuff that occurred in the first opinion. We think it's improper. They've overblown and taken him out of context. He's done nothing since the last appeal that would warrant reassignment. Largely, he didn't contravene or ignore this court's analysis. He, in fact, cited the guiding query that this court identified in its prior opinion. So there's just nothing that would warrant the exercise of this extraordinary power. Okay. Thank you, Mr. Dagovich. Okay, Mr. Connolly, back to you. Thank you, Your Honor. I counted, I think, four disclosures that they principally rely on. If I could just say that the context for deciding them, though, is in the guiding query proposed or propounded by Judge Southwick, is could you have reduced the substance of this complaint merely by synthesizing these public disclosures? The answer clearly, in our view, is no. Let me talk. I talked a little bit about Wright. Well, I mean, he doesn't mean the dollar figure. He means the basic scheme. Correct. And he's saying the basic scheme of deducting transportation expenses is all over Wright, arguably reserved in Johnson, Auger. We didn't really let him get to them. I didn't let him talk more about Mars. Well, no, the scheme here, you have to look at specifics. It's not just if we came in with a complaint, and this is what happened in Jameson v. McKesson, I think, came in with a complaint that shells improperly deducting transportation costs. If that was our complaint, then you could say that's exactly what was alleged in Wright, and that was preserved in Johnson, and that was a subject of Auger, and, you know, forget about Mars. That's not what our complaint is. If a complaint is that broad in general, I don't think it would survive 9b anyway, but if it were, you could say, well, that kind of tracks with. What about the specific paragraph you mentioned in Wright? Yeah, yeah, right, and that's on page 106 of the complaint against 45 people. After saying that never, never allowed, they said 106 starts, and 372, I think he quoted, says that you deducted costs in excess of the reasonable necessary cost of transportation. The subparagraph, they said, as provided by FERC. Well, that proves our point. FERC is not even in the business anymore and was not in the business in 2001 of regulating interstate pipeline rights. Okay, taking transportation deductions with respect to pipelines determined to be production or gathering facilities exempt from regulation by FERC under the Natural Gas Act. And that proves our point. FERC was in the regulatory business at the time of the Wright complaint. Not anymore, so that's irrelevant to us. FERC is no longer relevant in this issue. So that actually proves the timing, and that just proves that it's a totally unrelated allegation, and that's a. . . Is your claim based on the lease or based on regulation? It's based on the lease. It's based on regulations. It's based on the law. It's not based on, as Wright was, on an argument that never is transportation allowed because the leases are contrary to the law. And so I think. . . You're saying if we construe the lease, if we ever get to the merits of this case, and we construe the lease, we will find, in your view, that Shell improperly made deductions. The lease and the regulation, the regulation which says you cannot deduct gathering to a central accumulation point and to the first place where the oil surfaces. And each of these 12 leases, the allegation is that this is the very first place it surfaced, and in some cases it was moved. . . You know, it was. . . The place where they allegedly moved it from was adjacent to the lease, which is also. . . I thought your whole point was these are very specific leases about taking kind and where. . . Kind of where you pick up the package, to use my very. . . Yep. Yes, and in-kind oil is different in that respect. And given the leases, given in-kind program, and given the regulations, there is no possibility. . . This is the allegation, and we stand by it. No possibility for transportation on these 12 leases. Certainly transportation is allowed when you move it from the store to the person's home. You can charge for FedEx, but if you're not moving it by FedEx, you can't say we're going to charge you to pick it up at the store. So I think your court's analogy is better than one I ever thought of, so I think I'll stick by that analogy. What about the remand if we do remand to a different judge? I think now, Your Honor, this case is now eight years old. We're still stalled at square one. Five years, as I said, of that delay is at the hands of the district court. The district court made comments originally saying you have no cases, no false claims. See, we didn't find that enough then. No, you didn't. And I think the new part is extraordinary to me that the district court never cited this court's opinion, directly contravened it. My friend from Fulbright, Mr. Dekovich, is not going to say that speculative squares were specific. It's not going to say that this court said don't consider audits, and the court said the third category is audits. It's not going to say that the court said it's too broad, and the court started out by saying this is a broad exclusion. Directly contravened it in three ways. Take a few seconds and talk about the Johnson release. Yes. The Johnson release, I think, has to be recognized in conjunction with the allegation in Johnson. The allegation in Johnson were that the offshore prices were too high, and the transportation was allowed in that case, but was too high. Too high an allowance for transportation. Offshore posting from 88 to 98. In January of 01, the court settles that, or the government settles that case and says we reserve the right on several leases, one of which happens to be our lease. Our allegation is in October of 01, several months later, they started taking improper deductions on royalty and kind. Nothing in Johnson alerts anybody to the fact that on any of these leases, much less the 11 not mentioned there. The timing doesn't work. The timing doesn't work, but also the allegation is different. This is a different allegation than the one settled in Johnson. So the fact is, as Judge Haynes said, that you have a broad saying we're going to preserve our right to challenge transportation deductions, doesn't say that you're taking transportation for things where you're not transporting oil, and that's our core allegation. Okay, thank you very much. Thank you, Your Honor. We have your case. All right.